**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| **SAMANTHA HARRISON** | ) | |
| | ) | **Case No. 3:25-cv-01406** |
| **v.** | ) | **Magistrate Judge Hill** |
| | ) | |
| **COMMISSIONER OF SOCIAL SECURITY** | ) | |

# MEMORANDUM OPINION

Plaintiff Samantha Harrison filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Social Security Administration ("SSA") denying her disability child's insurance benefits[1] under Title II and supplemental security income ("SSI") under Title XVI of the Social Security Act (the "Act"). The case is currently pending on Plaintiff's motion for judgment on the administrative record (Docket No. 13) and supporting memorandum (Docket No. 13-2), to which Defendant SSA responded (Docket No. 16) and Plaintiff replied (Docket No. 17). The parties have consented to entry of final judgment by a United States Magistrate Judge under the provisions of 28 U.S.C. § 636(c), with any appeal to the Court of Appeals for the Sixth Circuit. (Docket No. 8).

Upon review of the administrative record as a whole and consideration of the parties' filings, Plaintiff's motion (Docket No. 13) is **GRANTED**. For the reasons stated herein, the Court **REMANDS** this matter to the Social Security Administration for further administrative proceedings consistent with this Memorandum Opinion.

[1] To be entitled to child's benefits, a claimant must show that she was dependent upon a deceased parent who received benefits and that she herself has a disability that began before she reached the age of 22. *See* 20 C.F.R. § 404.350(a). The parties do not appear to dispute that Plaintiff may be eligible for these benefits.

## I. INTRODUCTION

On January 27, 2023, Plaintiff filed an application for disabled child's insurance benefits and SSI. (Transcript of the Administrative Record (Docket No. 11) at 23).[2] In her application, Plaintiff asserted that, as of the alleged onset date of May 12, 2021, she was disabled and unable to work due to the following physical or mental conditions: postural orthostatic tachycardia syndrome ("POTS"); bipolar II disorder; anxiety; hypoglycemia; migraine; chronic nausea; chronic vomiting; depression; and scoliosis. (AR 408).

Her claim was denied initially on October 13, 2023, and upon reconsideration on April 27, 2024. (AR 85–112). Administrative Law Judge ("ALJ") Scott Shimer held a hearing on November 7, 2024, at which Plaintiff appeared via online video with counsel and testified. (AR 20–62). On January 24, 2025, the ALJ denied Plaintiff's claim. (AR 23–54). On September 29, 2025, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner. (AR 7–12). Plaintiff then timely commenced this civil action pursuant to 42 U.S.C. § 405(g). (Docket No. 1).

## II. THE ALJ'S FINDINGS

The ALJ included the following enumerated findings in the January 24, 2025 decision:

1. Born on December 1, 1999, the claimant had not attained age 22 as of May 12, 2021, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2. The claimant has not engaged in substantial gainful activity since May 12, 2021, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: postural orthostatic tachycardia syndrome ("POTS") versus vasovagal syncope, Ehlers-Danlos syndrome ("EDS"), obesity, bipolar disorder, attention deficit-hyperactivity disorder ("ADHD"), autism

[2] The Transcript of the Administrative Record is hereinafter referenced by the abbreviation "AR" followed by the corresponding Bates-stamped number(s) in large black print in the bottom right corner of each page.

spectrum disorder, and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in section 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is limited to only occasionally balance, stoop, kneel, crouch, and crawl. She is limited to no climbing ladders, ropes, or scaffolding. She is limited to no working at unprotected heights or around unguarded, moving machinery. She is limited to no jobs requiring driving, and no concentrated exposure to high temperatures. The claimant is able to maintain concentration, persistence, and pace for simple, routine tasks and tolerate occasional workplace changes. She could have occasional interaction with the general public, coworkers, and supervisors.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on December 1, 1999, and was 21 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 12, 2021, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(AR 25–53).

## III. REVIEW OF THE RECORD

The parties and the ALJ, in combination, have thoroughly summarized and discussed the medical and testimonial evidence of the administrative record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## IV. DISCUSSION AND CONCLUSIONS OF LAW

### A. Standard of Review

The determination of disability under the Act is an administrative decision. The only questions before this Court upon judicial review are: (1) whether the SSA's decision is supported by substantial evidence, and (2) whether the proper legal criteria were applied to the SSA's decision. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)). The SSA's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley,* 581 F.3d at 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially like that in *Richardson*).

The SSA utilizes a five-step sequential evaluation process to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a). If the issue of disability can be resolved at any point during the evaluation, the ALJ does not proceed to the next step and the claim is not reviewed further. *Id*. First, if the claimant is engaged in substantial gainful activity, she is not disabled. *Id.* Second, if the claimant does not have a severe medically determinable impairment that meets the 12-month durational requirements, she is not disabled. *Id.* Third, if the claimant suffers from a listed impairment, or its equivalent, for the proper duration, she is presumed disabled. *Id.* Fourth, if the claimant can perform relevant past work based on her residual functional capacity ("RFC"),

which is an assessment of "the most you [the claimant] can still do despite your limitations," 20 C.F.R. § 404.1545(a)(1), she is not disabled. *Id.* Fifth, if the claimant can adjust to other work based on her RFC, age, education, and work experience, she is not disabled. *Id.* The claimant bears the burden of proof through the first four steps, while the burden shifts to the SSA at step five. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)).

The Court's review of the SSA's decision is limited to the record made in the administrative hearing process. *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991). A reviewing court may not try a case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record is without substantial evidence to support the ALJ's determination. *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

**B. Plaintiff's Assertions of Error**

In her motion and supporting briefing, Plaintiff asks the Court to "vacate[]" the SSA's decision and remand the matter back to the SSA for further consideration, presumably pursuant to sentence four of 42 U.S.C. § 405(g). (Docket No. 13-2 at 22). This request is based on two assertions of error: (1) the ALJ improperly rejected all medical opinions related to Plaintiff's impairments and formulated the RFC based on his lay opinion; and (2) the ALJ improperly evaluated the medical necessity of Plaintiff's wheelchair. (*Id.* at 10–21).

All of these assertions of error concern Plaintiff's RFC, which is limited to "light" work with certain exceptions. (AR 23). "Light" work is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may

> be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 1567(b). The ALJ included the following additional exertional and environmental limitations:

- occasional balancing, stooping, kneeling, crouching, and crawling
- never climbing ladders, ropes, or scaffolding
- never working at unprotected heights or around unguarded, moving machinery
- never driving
- never being exposed to high temperatures
- occasion interaction with the general public, coworkers, and supervisors
- maintaining concentration, persistence, and pace for simple, routine tasks
- occasional workplace changes

(AR 32).

Courts review an ALJ's RFC determination for substantial evidence. *See Blakley*, 581 F.3d at 405–06. Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co.*, 305 U.S. at 229). "In formulating a residual functional capacity, the ALJ evaluates all relevant medical and other evidence and considers what weight to assign to treating, consultative, and examining physicians' opinions." *Eslinger v. Comm'r of Soc. Sec.*, 476 F. App'x 618, 621 (6th Cir. 2012) (citing 20 C.F.R. § 404.1545(a)(3)). An ALJ "need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002).

### 1. <u>The ALJ's Consideration of the Medical Opinion Evidence</u>

In the decision, the ALJ evaluated approximately twelve medical opinions when formulating the RFC. However, Plaintiff argues that the ALJ formulated an RFC "without relying on a single medical opinion" that addressed Plaintiff's physical impairments and related exertional, postural, and environmental limitations. (Docket No. 13-2 at 11). She contends that the ALJ reached his own independent conclusions from diagnostic studies, examination reports, and MRIs rather than from medical opinions, which is "precisely the kind of lay medical interpretation that courts within the Sixth Circuit have condemned." (*Id.* at 15). She asserts that "[w]ithout a medical opinion translating the Plaintiff's POTS [postural orthostatic tachycardia syndrome], syncope, EDS [Ehlers-Danlos syndrome], and hypermobility into functional limitations, the RFC lacks substantial evidence." (*Id.* at 17).

Plaintiff identifies the following six opinions as the ones that address her exertional, postural, and environmental limitations, but which the ALJ allegedly discounted: (1) consultative examiner Wiliam Huffman, M.D.'s January 7, 2021 opinion; (2) state agency medical consultant Glenda Knox-Carter, M.D.'s January 20, 2021 opinion; (3) state agency medical consultant Reeta Misra, M.D.'s October 12, 2023 opinion; (4) state agency medical consultant George Walker, M.D.'s April 22, 2024 opinion; (5) provider Lydia Seibart, PA-C's September 6, 2024 opinion; and (6) provider Angela Qian, M.D.'s October 2, 2024 opinion. (*Id.* at 12–13).

*First*, Dr. Huffman examined Plaintiff on January 7, 2021. (AR 844–46). He diagnosed her with back pain, obesity, history of migraine headaches, history of hypoglycemia, and arthralgia. He opined that she was limited to lifting no more than 30 pounds, and could sit, stand, and walk for up to 7 hours per day. The ALJ found Dr. Huffman's opinion to be "generally persuasive." (AR 46). The ALJ stated that, although the examination predated Plaintiff's alleged onset date of

May 12, 2021, the opinion was supported by the "grossly normal" examination findings. However, the opinion was inconsistent with Plaintiff's subsequent diagnoses of POTS and EDS. The ALJ found that the opinion supported a light exertional capacity, but that additional postural and environmental limitations were necessary to account for Plaintiff's POTS and EDS.

*Second*, Dr. Knox-Carter opined on January 20, 2021 that Plaintiff could perform a full range of medium work. (AR 122–31, 142–51). This opinion was rendered based on a review of medical opinions, including the opinion of Dr. Huffman, and medical records dated from 2018 to early 2021. The ALJ found Dr. Knox-Carter's opinion to be "not persuasive." (AR 46). The opinion was based on medical records from a period predating the alleged onset date of May 12, 2021, so the limitations were inconsistent with more recent medical evidence that included diagnoses for POTS, EDS, and vasovagal syncope. Accordingly, the ALJ found that additional postural and environmental limitations were necessary to account for Plaintiff's pain and other symptoms.

*Third*, Dr. Misra opined on October 12, 2023 that Plaintiff's impairments were not severe, but that "[t]he current functional information is insufficient to make a thorough analysis of consistency." (AR 155–70). The ALJ found Dr. Misra's opinion to be "not persuasive." (AR 46–47). He found that the totality of the medical evidence showed ongoing treatment for POTS, EDS, and pain symptoms, which was inconsistent with Dr. Misra's determination that these impairments were not severe. He also found that Plaintiff's function report and testimony provided sufficient information for Dr. Misra to evaluate Plaintiff's claim.

*Fourth*, Dr. Walker opined on April 22, 2024 that Plaintiff had no exertional limitations, but had the postural limitations of never climbing ladders, ropes, or scaffolds because she could not be at unprotected heights, and should avoid even moderate exposure to hazards. (AR 173–92).

The ALJ found Dr. Walker's limitation on climbing to be "persuasive" but found that the medical evidence supported greater exertional, postural, and environmental limitations than what was included by Dr. Walker. (AR 47). The ALJ stated that the totality of the evidence, which indicated periods of weakness, loss of vibratory sensation, a diagnosis of EDS with hypermobility, and obesity, and the longitudinal medical evidence supported "greater exertional, postural, and environmental limitations."

*Fifth*, Ms. Seibert, a certified physician assistant, treated Plaintiff at Boro Medical Clinic from approximately February 14, 2024 to October 7, 2024. (AR 2129–53). Ms. Seibert opined on September 6, 2024 that Plaintiff had a number of diagnoses – including joint pain, POTS, chronic migraines, ADHD, and mast cell activation syndrome – that caused limitations and restrictions. (AR 1765–67). Ms. Seibert opined that Plaintiff could sit for 2 of 8 hours in a workday; could sit for 30 minutes at a time; could never lift or carry any weight; would require 4 hours of bedrest during a normal workday; would require 1 hour of rest for every 1 hour of work; would have daily lapses in concentration or memory; could occasionally finely manipulate, type, write, and grasp small objects; and would be absent from work at least 15 days per month.

The ALJ found Ms. Seibert's opinion to be "unpersuasive." (AR 47–48). The ALJ stated that the opinion appeared to be based on the subjective complaints and reported functional limitations that Plaintiff made during a telephonic visit with Ms. Seibert the day before the opinion was made. (AR 2141–44). The ALJ stated that it was "not clear" how Ms. Seibert determined, based on a visit that lasted approximately 45 minutes, that Plaintiff's fine manipulation skills or ability to sit were limited. The ALJ found that Ms. Seibert's opined limitations were inconsistent with both Plaintiff's activities, which included hiking and backpacking trips, swimming, and picking up a wheelchair, and the medical evidence, which showed "managed POTS/syncope, and

the normal testing, including autonomic testing, EMG study, and imaging studies." Specifically, the ALJ found that Ms. Seibert's opined rate of absenteeism and deficits in concentration and memory were not supported.

*Sixth and finally*, Dr. Qian served as Plaintiff's primary care provider at Vanderbilt Primary Health Clinic from approximately August 2020 to October 2024. (AR 1768–70). Dr. Qian opined on October 2, 2024 that Plaintiff had a number of diagnoses, including hypermobile EDS, POTS, tachycardia, vasovagal syncope, and more, that caused limitations and restrictions. (AR 2252–54). She opined that Plaintiff could sit for 3 of 8 hours in a workday; could sit for 30 minutes at a time; could stand or walk for less than 1 of 8 hours in a workday; could stand or walk for less than 10 minutes at a time; could occasionally lift up to 5 pounds; could infrequently lift up to 20 pounds; could never lift more than 20 pounds; would require 5 hours of bedrest during a normal workday; would require 1 hour of rest for every 30 minutes of work; would have daily lapses in concentration or memory; could occasionally type; could infrequently finely manipulate, write, and grasp small objects; and would be absent at least 16 days per month from work. Dr. Qian also provided a handwritten addendum stating that Plaintiff was diagnosed with POTS by a cardiology clinic in 2021 and that Plaintiff had evaluations and confirmed diagnoses for connective tissue disorder and EDS, but that Plaintiff's symptoms preceded those diagnoses by "many years."

The ALJ found Dr. Qian's opinion to be "not persuasive." (AR 48–49). The ALJ wrote that Dr. Qian provided "little support" in her opinion for such significant limitations. The ALJ stated that Dr. Qian "summarizes the claimant's diagnoses, but does not provide any citation or explanation of the relevant exam findings, diagnostic workups, or other objective clinical findings that would support such limitations." Just as with Ms. Seibert, the ALJ found that Dr. Qian's opined limitations were based largely on the subjective complaints and reported functional

limitations that Plaintiff made during a telephonic visit with Dr. Qian the day the opinion was made. (AR 1910–14). The ALJ found Dr. Qian's opined limitation were inconsistent with both Plaintiff's activities, which included hiking and backpacking trips, swimming, and picking up a wheelchair, and the medical evidence, which showed "normal autonomic testing and normal EMG/NCS, and generally well controlled POTS/syncope and migraines."

Plaintiff does not argue that the ALJ improperly evaluated these six medical opinions. Rather, she argues that the ALJ improperly formulated the RFC because the ALJ rejected all medical opinions related to Plaintiff's physical impairments and therefore "had no medical basis" to determine Plaintiff's RFC. (Docket No. 13-2 at 14). In response, the SSA argues that the ALJ's determination of Plaintiff's RFC was supported by substantial evidence. (Docket No. 16 at 11–13). The SSA asserts that the ALJ was not obligated to rely on any specific medical opinion to formulate the RFC because "[t]he effect of a claimant's conditions on her ability to work . . . is a determination expressly reserved for the ALJ." (*Id.* at 11 (quoting *Reinartz v. Comm'r of Soc. Sec.*, 795 F. App'x 448, 449 (6th Cir. 2020)). The SSA then argues that Dr. Huffman's opinion and the state agency medical consultants' prior administrative findings support the ALJ's determination that Plaintiff's impairments were not disabling. (*Id.* at 12). Finally, the SSA contends that the ALJ properly considered the record as a whole and found that "Plaintiff's periods of weakness with otherwise normal examinations supported a limitation to light work." (*Id.*).

An ALJ is responsible for determining a claimant's RFC after reviewing all the relevant evidence of record. *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727–28 (6th Cir. 2013). The RFC opinions of treating physicians, consultative physicians, and medical experts who testify at hearings are crucial to determining a claimant's RFC because "[i]n making the residual functional capacity finding, the ALJ may not interpret raw medical data in functional terms." *Isaacs v. Astrue*,

No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (quoting *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008)). *See also Smiley v. Comm'r of Soc. Sec.*, 940 F.Supp.2d 592, 600–01 (N.D. Ohio 2013). Accordingly, because medical opinions are such an important piece of evidence to support a claimant's RFC, ALJs have been cautioned against relying on their own expertise in drawing RFC conclusions from raw medical data. *See id.* This sentiment is further supported by the SSA regulations, which state that an ALJ must "explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision." 20 C.F.R. § 416.920c(b)(2).

In addition, the applicable SSA regulations "require that the ALJ provide a coherent explanation of his reasoning." *Lester v. Saul*, No. 5:20-cv-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, No. 20-1364, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021). The ALJ must provide a "minimum level of articulation" in his determinations and decisions to "provide sufficient rationale for a reviewing adjudicator or court." *Warren I v. Comm'r of Soc. Sec.*, No. 20-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)). A failure to meet these "minimum levels" of articulation "frustrates" the court's ability to determine if the ALJ's decision was support by substantial evidence. *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 906 (quoting *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021)).

The Court finds that substantial evidence supports the ALJ's formulation of the RFC based on medical opinions. The RFC adequately accounted for all limitations the ALJ found credible. In formulating the RFC, the ALJ did not rely solely on "raw medical data" or "play doctor" as

Plaintiff contends. As detailed above, the ALJ thoroughly reviewed and discussed several opinions concerning Plaintiff's physical impairments, as well as medical records, hearing testimony, and function reports. Although the ALJ found several opinions concerning Plaintiff's physical impairments to be unpersuasive, he did not completely reject every potion of every opinion. For example, the ALJ found Dr. Huffman's opinion to be "generally persuasive." The opinion's suggested "limitation to a light exertional capacity" appeared "reasonably consistent with subsequent exams showing grossly normal motor and sensory findings with degenerative changes in the lumbar spine, but without high-grade stenosis or neuroforaminal narrowing, and no other diagnostic testing to support neuropathy or other neurologic deficits." (AR 46). If anything, the ALJ found that, with respect to several medical opinions, further postural and environmental limitations were needed based on Plaintiff's diagnoses of POTS and EDS. For those opinions that he fully discounted, he clearly articulated why he found them to both not supportable and not consistent. Further, Plaintiff has not pointed to any evidence in the record that the ALJ overlooked or omitted that would indicate that the ALJ erred in his RFC determination.

This Court is limited to determining whether substantial evidence supported the ALJ's RFC. That substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakley*, 581 F.3d at 406. Here, there was evidentiary support in the record for the ALJ's RFC finding, at least with respect to the ALJ's evaluation of the medical opinions. Given that the ALJ's RFC determination is properly within the permitted "zone of choice," the Court concludes that the RFC is supported by substantial evidence with respect to medical opinions. For these reasons, the Court rejects Plaintiff's first assertion of error.

### 2. The ALJ's Consideration of Plaintiff's Assistive Device

The ALJ did not include a limitation for an assistive device, like a wheelchair, in Plaintiff's RFC. The ALJ explained his decision as follows:

> There is no evidence indicating that the claimant either requires an ambulatory aide that requires use of both upper extremities or cannot perform fine and gross movements with at least one upper extremity due to a combination of extremity-related limitations and requires the use of a medically necessary mobility device. The claimant testified that she uses a wheelchair for up to 75 percent of the day, and that she is unable to walk around her home much at all without it. The medical evidence does show that she was provided a wheelchair and, later, a power-assisted wheelchair around June 2023 (Exhibits 11F/17-19, 41-45; 36F). Thereafter, she presented to her medical appointments in a wheelchair (e.g., Exhibits 14F/34; 20F/1; 24F/2; 28F/4-9, 20).
>
> However, the undersigned finds that the assistive device is not medically necessary, and the claimant has not required the use of a wheelchair or other assistive device throughout the relevant period. First, one of the claimant's primary care providers recommended further evaluation prior to proceeding with a wheelchair in February 2023, stating that she did not feel that this was appropriate medical treatment for the claimant (Exhibit 9F/31). The claimant has also demonstrated a normal, unassisted gait in January 2021, October 2021, December 2021, January 2022, June 2022, and August 2022 (Exhibits 5F; 7F/17-19; 9F/61, 122, 134-135; 11F/82). She used a wheelchair for mobility during neurology exams on June 1 and September 14, 2023, but those exams also noted that she was able to rise to standing and get onto the exam table without difficulty (Exhibit 11F/34, 45). She had a normal, casual gait on September 26, 2023 (Exhibit 14F/29). The claimant reported that she could hike without getting too sore or lightheaded if the weather is cool during a visit in September 2023 (Exhibit 14F/39). She had gone on a three-day backpacking/hiking trip in December 2023, and she reported being able to hike for the first two days of that trip before worsening pain by day three (Exhibit 30F/4-5). She stated that this was the reason she for her wheelchair, but this is not consistent with the medical evidence, as she had requested a wheelchair as early as June 2023, but had gone on a hike without apparent issue in September 2023. She had some exams noting weakness in the lower extremities, but other exams generally found intact sensation and motor strength in the lower extremities (Exhibit 11F/19; 20F/2-3; 23F/18; 25F/4; 28F/4-9). Finally, the objective, diagnostic medical evidence did not reveal any neurologic abnormality, such as nerve compression in the spine, neuropathy, mononeuropathy, or other deficit that would support the need for an assistive device or wheelchair (Exhibits 19F/1-3; 35F/2). Her most recent workups found normal cardio vagal responses and no orthostatic hypotension or tachycardia (Exhibit 14F/32). The medical evidence does not support finding that the claimant requires a wheelchair or other ambulatory assistive device as required by these listings, as she has not consistently demonstrated gait abnormalities, motor or

sensory deficits, and she has been able to engage in other exertional, ambulatory activities since she was initially provided her manual wheelchair.

* * *

Notably, the claimant requested a custom wheelchair order during a visit with her primary care clinic on February 2, 2023, and she requested port placement for IV hydration (Exhibit 9F/24). She presented with a wheelchair during that visit. However, Dr. Bunch, the examining physician during that visit, recommended additional workup and further evaluation, as Dr. Bunch suggested that there were concerns for other comorbidities that could be contributing to the claimant's symptoms (Exhibit 9F/31). Dr. Bunch recommended that the claimant proceed through cardiology or a POTS clinic. The claimant presented with a wheelchair and reported using it almost daily during her other, subsequent medical visits and follow-up visits (Exhibits 11F/17-19, 41-45; 14F/34; 20F/1; 24F/2; 28F/4-9, 20; 36F). However, as discussed at Finding 4 of this decision, the undersigned finds that the assistive device is not medically necessary, and the claimant has not required the use of a wheelchair or other assistive device throughout the relevant period. The claimant was using a wheelchair for mobility in June and September 2023, but she was also able to rise to standing and get into the exam table without difficulty during those visits (Exhibit 11F/34, 45). Moreover, she had a normal, casual gait on September 26, 2023 (Exhibit 14F/29). She had some exams noting weakness in the lower extremities, but other exams generally found intact sensation and motor strength in the lower extremities even when presenting in a wheelchair (Exhibit 11F/19; 20F/2-3; 23F/18; 25F/4; 28F/4-9).

Additionally, the record shows that the claimant was hiking and engaging in other physical activities that were not consistent with the need to use a wheelchair on an almost daily basis. She reported being able to hike without getting too sore or lightheaded if the weather is cool during a medical visit on September 14, 2023 (Exhibit 14F/39). She also reported that she had a couple of backpacking trips planned for the fall. She reported that she had a camping trip planned for Spring 2024 (Exhibit 14F/32). During a physical therapy evaluation in July 2024, the claimant stated that she had gone on a backpacking trip in December 2023, when she was feeling better and doing well, and that she felt foot on the first two days of the hiking trip before having increased pain and difficulty by the third day, but that she was able to finish the hike that day (Exhibit 30F/4-5). She stated that she was in a wheelchair because of the progressive pain and paralysis of her lower extremities because of that episode. However, but this is not consistent with the medical evidence, as she had requested a wheelchair as early as June 2023, but had gone on a hike without apparent issue in September 2023. The claimant testified that she started to enjoy camping and backpacking when her symptoms were more manageable, but that she was unable to do that as much by the end of 2023. She stated that she went on backpacking trips once a year, not regularly, and that these trips kept getting rescheduled because she was not having good days. She described her 2023 hike as less than a half mile and completely flat, and that her pack weighed

> less than 10 pounds. She stated that they ended up leaving the trip early because her POTS symptoms. She also stated that the half mile hike took 45 minutes to one hour because she had to stop and take breaks. The claimant testified that she had help with setting up her tent. However, despite the claimant's explanation of these camping/hiking trips, she remained capable of swimming and treading water at the lake in August 2024, and she reported moving a wheeled, 80-pound dog kennel, and lifting her wheelchair and a friend's wheelchair six times in October 2024 (Exhibit 30F/72). These activities are not consistent with paralysis, weakness, or other neurologic deficits necessitating the need for a wheelchair, or an inability to engage in most exertional activities, as alleged by the claimant. The undersigned also notes that the objective, diagnostic medical evidence, including MRIs, x-rays, an EEG study, and an EMG/NCS, did not reveal any neurologic abnormality, such as nerve compression in the spine, neuropathy, mononeuropathy, or other deficit that would support the need for an assistive device or wheelchair (Exhibits 14F/47-48; 19F/1-3; 35F/2).

(AR 29–30, 43–44). Plaintiff argues, however, that the ALJ's exclusion of an assistive device from the RFC was not supported by substantial evidence. (Docket No. 13-2 at 18–21).

An assistive device does not constitute an exertional limitation for purposes of an RFC unless the device is necessary for the claimant's use. *See Barnes v. Comm'r of Soc. Sec.*, No. 5:21-CV-01688-JDA, 2023 WL 2988346, at *7 (N.D. Ohio Mar. 22, 2023) (citing *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002); *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 508 (6th Cir. 2013) ("Because the ALJ found that the evidence did not suggest that Johnson needed a cane, it was not erroneous for the ALJ to exclude this factor in determining Johnson's RFC.")). Social Security Ruling ("SSR") 96-9p addresses the circumstances in which an assistive device is medically required and must be included in the RFC. It provides, in relevant part:

> Medically required hand-held assistive device: To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996).

"SSR 96-9p essentially contains two requirements before an ALJ may conclude that a hand-held assistive device is 'medically required.'" *Berry v. Saul*, No. 1:18-cv-01906, 2019 WL 4600433, at *9 (N.D. Ohio Sept. 23, 2019) (quoting SSR 96-9p). First, "there must be medical documentation establishing the need for said device to aid in walking/standing." *Id.* Second, the medical records must "also 'describ[e] the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information.'" *Id.* (quoting SSR 96-9p). Courts have held that "documentation describing the circumstances for which [the assistive device] is needed is critical to establishing that it qualifies as a 'necessary device' under SSR 96-9p." *Barnes*, 2023 WL 2988346, at *7 (quoting *Spies v. Saul*, No. 19-CV-2928, 2020 WL 5044027, at *16 (N.D. Ohio Aug. 26, 2020)) (citing *Fletcher v. Comm'r of Soc. Sec. Admin.*, No. 5:21-CV-02217-CEH, 2022 WL 6156951, at *18 (N.D. Ohio Oct. 7, 2022)).

The Court finds that the ALJ's omission of a limitation for an assistive device is not supported by substantial evidence. As Plaintiff points out, there is clear medical documentation establishing her need for a wheelchair. On July 7, 2023, Plaintiff was evaluated for a wheelchair after being referred for an assessment by her primary care provider, Dr. Qian. (AR 1411–17). After assessing Plaintiff, physical therapist Lorri Berhardt wrote an "Evaluation and Letter of Medical Necessity for a manual wheelchair" in which she recommended that Plaintiff use a "K0005 ultra lightweight manual wheelchair" to allow her to "return to participation with her MRADL [mobility-related activity of daily living] in the home." Ms. Berhardt stated that Plaintiff would need the wheelchair for "99 months." On July 12, 2023, Dr. Qian certified the need for the services furnished under Ms. Berhardt's plan. Approximately one year later, on June 18, 2024, Plaintiff

underwent another assessment with Ms. Bernhardt who provided an "Evaluation and Letter of Medical Necessity for a Smart Drive," in which she stated that Plaintiff required a wheelchair, and specifically "Smart Drive Power Assist." (AR 1836–42). Dr. Qian once again certified the need for the services furnished under Ms. Bernhardt's plan.

As set forth above, in his step three evaluation, the ALJ determined that there was no evidence that Plaintiff "either requires an ambulatory aide that requires use of both upper extremities or cannot perform fine and gross movements with at least one upper extremity due to a combination of extremity-related limitations and requires the use of a medically necessary mobility device." (AR 29). Later, when determining Plaintiff's RFC, the ALJ referred to this earlier finding and additionally stated that "the assistive device is not medically necessary, and the claimant has not required the use of a wheelchair or other assistive device throughout the relevant period." (AR 43). The Court finds that this determination is not supported by substantial evidence. The ALJ fails to adequately assess Dr. Qian and Ms. Bernhardt's assessments that Plaintiff's wheelchair was medically necessary. The ALJ describes the July 2023 assessment as "medical evidence . . . show[ing] that [Plaintiff] was provided a wheelchair and, later, a power-assisted wheelchair around June 2023." (AR 29). Similarly, the ALJ describes the June 2024 assessment as Plaintiff "request[ing] power assist for her wheelchair." (AR 41). In other words, the ALJ acknowledges that these records exist, but describes them as requests from Plaintiff rather than findings from medical providers. The ALJ fails to accurately discuss the substance of these records and how they impact an analysis under SSR 96-9p.[3]

[3] In the decision, the ALJ does not explicitly acknowledge SSR 96-9p. While such explicit acknowledgment may not be required, the ALJ must nevertheless comply with the regulation.

Although the Court agrees with the ALJ that the record is inconsistent as to Plaintiff's use of or need for a wheelchair, there is clearly "medical documentation establishing the need for said device to aid in walking/standing." *Berry*, 2019 WL 4600433, at *9. In other words, it may be that the ALJ finds that a wheelchair is not medically necessary under SSR 96-9p. However, as it stands, the ALJ's reasoning omits any consideration of Dr. Qian and Ms. Bernhardt's assessments, which must factor into the ALJ's analysis in a more substantive and accurate way.

Thus, the Court cannot find that substantial evidence supports the ALJ's conclusion that there is no evidence to indicate that an assistive device is medically necessary. For these reasons, the Court cannot find that the ALJ appropriately formulated the RFC. Accordingly, remand is required.

## V. CONCLUSION

For the above stated reasons, Plaintiff's motion for judgment on the administrative record (Docket No. 13) is **GRANTED** and this matter is **REMANDED** to the Social Security Administration for further administrative proceedings consistent with this memorandum opinion.

An appropriate Order will accompany this memorandum opinion.

It is SO ORDERED.

Lynda M. Hill

LYNDA M. HILL
United States Magistrate Judge